```
UNITED STATES DISTRICT COURT FOR THE
   WESTERN DISTRICT OF NORTH CAROLINA
            CHARLOTTE DIVISION
          CASE NO. 3:08-cv-158-RJC
```

| | |
|---|---|
| **CAROLINA MATERIALS, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| **CONTINENTAL CASUALTY** ) | |
| **COMPANY/CNA INSURANCE** ) | |
| **COMPANIES,** ) | |
| ) | |
| **Defendant.** ) | |

**THIS MATTER** is before the Court on Defendant's Motion for Partial Summary Judgment. (Doc. No. 31). Plaintiff filed a Response (Doc. No. 32) and Defendant filed a Reply (Doc. No. 33), which are now before the Court. For the reasons stated below, the Court **DENIES** Defendant's Motion for Summary Judgment.

**I.     FINDINGS OF FACT**

    **A.     The Policy**

This action arises out of an insurance contract between Plaintiff Carolina Materials, LLC ("CML"), and Defendant Continental Casualty Company ("CNA"). CNA issued a Boiler and Machinery policy ("Policy") to CML for the Policy Period of June 11, 2006 to June 1, 2007.

1

(Doc. No. 31-8 at 4). In the event of a "Breakdown"[1] to "Covered Equipment,"[2] coverage under the Policy may extend to (1) "Property Damage," (2) "Expediting Expenses," and (3) "Business Income and Extra Expenses."[3] If coverage extends to Business Income and Extra Expense, the Policy explains, "We will pay: (a) Your actual loss of 'Business Income' during the 'Period of Restoration'; and (b) The 'Extra Expense' you necessarily incur to operate your business during the 'Period of Restoration'." (Doc. No. 31-3 at 6).

The Policy includes an Endorsement for "Spare Equipment and Parts,"[4] which modifies the insurance coverage provided in the event of a Breakdown to an Extruder:[5]

> The following paragraphs apply in the event of a "Breakdown" to "Covered Equipment"[6] described in the Schedule and located at the premises shown in the Schedule:
> A.    If all of the following conditions are met at the time of the "Breakdown" then the applicable coverage and deductible(s) for the described "Covered

---

[1] "Breakdown" means "sudden and accidental direct physical loss to 'Covered Equipment,' which manifests itself by physical damage, necessitating its repair or replacement, unless such loss is otherwise excluded within this Coverage Form." (Doc. No. 31-3 at 18).

[2] "Covered Equipment" means "(1) Equipment built to operate under internal pressure or vacuum other than weight of contents; (2) Electrical or mechanical equipment that is used in the generation, transmission or utilization of energy; (3) Communication equipment, and 'Computer Equipment'; and (4) Equipment in Paragraphs (1), (2) and (3) that is owned by a public or private utility and used solely to supply utility services to your premises." (Doc. No. 31-3 at 18). This definition applies to Covered Equipment under the Policy; Covered Equipment in the Endorsement is defined differently. See infra note 6.

[3] "Business Income" means "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and Continuing normal operating expenses incurred, including payroll." (Doc. No. 31-3 at 19). "Extra Expenses" means "the additional cost you incur to operate your business during the 'Period of Restoration' over and above the cost that you normally would have incurred to operate the business during the same period had no 'Breakdown' occurred." (Doc. No. 31-3 at 19).

[4] The Schedule within the Endorsement defines "Spare Equipment And/Or Parts" as "Motors, Gear Sets, Barrels and Screws." (Doc. No. 31-3 at 25).

[5] "Extruder" is not defined in the Endorsement.

[6] The Schedule defines "Covered Equipment" as "Extruders." This definition of Covered Equipment only applies to the Endorsement.

2

>     Equipment" will be those shown elsewhere in the policy and not those shown in the Schedule.
>     The spare equipment and/or parts described in the schedule must be:
>     1.  In functional condition and ready for installation and use;
>     2.  At the premises, shown in the Schedule, where spare equipment and/or parts are located; and
>     3.  Available for your use.
> B.  If any of the conditions in Paragraph A. are not met at the time of the "Breakdown", then the applicable coverage and deductible(s) for the described "Covered Equipment" will be those shown in the Schedule and not those shown elsewhere in the policy.

(Doc. No. 31-3 at 25). Therefore, if a Breakdown occurs to an Extruder and the insured has not complied with Paragraph A of the Endorsement, then the applicable coverage includes only Property Damage; coverage will not extend to Business Income or Extra Expenses.

**B.     The Breakdown of Covered Equipment on October 26, 2006**

On October 26, 2006, defective regrind resins produced hydrochloric acid which damaged CML's Nanjing Giant sheet extrusion machine ("Extruder").[7] (Doc. No. 1 at 4). CML alleges that the damage caused the loss of production for the entire line of CML's high-end products. (Id.). When the damage occurred to the Extruder, CML had no functional spares of either the barrel or screw, as required by Paragraph A of the Endorsement. (Doc. No. 32 at 1-2).

CML filed its lawsuit on April 10, 2008, seeking a declaration that CNA is obligated to pay certain losses allegedly incurred following the Breakdown of the Extruder, including "lost business income, a portion of continuing normal operating expenses incurred, as well as [CML's] costs to repair and/or replace the Extruder to make it fully operational again." (Doc. No. 1 at 6). CML also alleges breach of contract. CNA seeks partial summary judgment on the issue of

---

[7] The parties dispute whether the damage occurred to the Extruder and its component parts or whether the damage occurred to the Extruder as well as other Covered Equipment.

Business Income and Extra Expenses. CNA argues that CML failed to comply with the requirements of the Endorsement, and therefore, the Endorsement limits CML's coverage solely to Property Damage to the Extruder.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Once this initial burden is met, "the burden shifts to the nonmoving party to show that there are genuine issues of material fact." Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008). The party opposing a motion for summary judgment may not rest upon mere allegations or denials in his pleadings, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)); see Anderson, 477 U.S. at 252 (explaining that a "mere existence of a scintilla of evidence" is insufficient to overcome summary judgment). "[T]he non-moving party must present sufficient evidence such that 'reasonable jurors could find by a preponderance of the evidence' for the non-movant."

Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 818 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 252). When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587.

## III. ANALYSIS

In North Carolina, the meaning of the language used in an insurance policy is a question of law. Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (N.C. 1970). When construing the terms of an insurance policy, a court must enforce the policy as written, "without rewriting the contract or disregarding the express language used." Newton v. U.S. Fire Ins. Co., 391 S.E.2d 837, 839 (N.C. Ct. App. 1990) (internal quotation marks omitted). If the policy terms are "plain, unambiguous, and susceptible of only one reasonable construction, the courts will enforce the contract according to its terms." Register v. White, 599 S.E.2d 549, 553 (N.C. 2004) (internal quotation marks omitted). When the policy defines a term, "this is the meaning which must be given to that term wherever it appears in the policy, unless the context clearly requires otherwise." Wachovia Bank, 172 S.E.2d at 522. Absent a definition, nontechnical terms in the policy should be given their ordinary meaning, unless the context otherwise requires. Id.

If the meaning of a term is ambiguous or uncertain, the meaning must be resolved in favor of the policyholder. Id. A policy term is not ambiguous merely because the parties dispute the meaning. Id. Ambiguity only exists if "the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Id.

In light of North Carolina's principles of construction, exclusions from coverage are to be

5

strictly construed to provide coverage. Id. at 522-23.

### A.  Extruder is an ambiguous term in the Policy

The parties dispute the meaning of the term Extruder. Extruder is a technical term that is not defined in the Policy. CNA claims that an Extruder consists of several components, including the cooling rolls and the die and lips. To support its argument, CNA relies upon three paragraphs in the Complaint, which define the equipment as components of the Extruder. (Doc. No. 1 at 3, 6: Compl. ¶¶ 9, 11, 19).

CML defines the Extruder as a "device that actually accepts, combines, melts, and mixes the raw material." (Doc. No. 32-3 at 2). CML claims that the extrusion die and lips and cooling rolls are Covered Equipment not part of the Extruder. To support its argument, CML relies upon an affidavit of Phil Friedman, CEO of CML, and a report created by CNA's investigator. In the affidavit, Friedman states that "[n]either the sheet extrusion die nor the cooling rolls are part of the actual extruder." (Doc. No. 32-3 at 2). In the report, the CNA investigator states that the "extrusion system" consists of several basic subparts. The investigator explains, "The extruder takes the hopper fed raw feedstock and transports it down the inside of a screw and barrel assembly where it is heated and melted in a controlled manner. . . . The melted plastic exits the extruder into a sheet extrusion die. The extruder and die are typically separated by a section called a head zone . . . . The sheet exits the die onto the first of typically three cooling rolls." (Doc. No. 32-4 at 5).

Extruder is "fairly and reasonably susceptible to either of the constructions for which the parties contend." Wachovia Bank, 172 S.E.2d at 522. Extruder is not defined in the Policy, the term is not used commonly, and the context of the Endorsement provides no insight into the

6

meaning of Extruder. Thus, the Court finds that the term Extruder is ambiguous. Under North Carolina principles of construction, an ambiguous term in an insurance policy must be construed in favor of the policyholder.

### B. The Endorsement is an Exclusion

The parties also dispute whether the Endorsement is an Exclusion under the Policy. "In [an] insurance policy, [an] 'exclusion' is [a] provision which eliminates coverage where were it not for [the] exclusion, coverage would have existed." Vaughan v. Carolina Indus. Insulation, 643 S.E.2d 613, 618 (N.C. Ct. App. 2007) (alterations in original). "By definition, an exclusion limits the extent of the coverage set forth in an insurance policy." N.C. Farm Bureau Mut. Ins. Co. v. Fowler, 589 S.E.2d 911, 914 (N.C. Ct. App. 2004)

Under Section A of the Policy, Property Damage and Business Income and Extra Expenses are listed as types of coverage. If certain conditions are not met, the Endorsement limits the type of coverage to solely Property Damage. The Endorsement eliminates the Business Income and Extra Expenses coverage that would have otherwise existed. Therefore, the Endorsement is an exclusion, and the terms of the Endorsement must be strictly construed as to provide coverage to the insured. Maddox v. Colonial Life & Acc. Ins. Co., 280 S.E.2d 907, 908 (N.C. 1981).

Under the principles of construction for exclusions and ambiguous terms, the Court finds in favor of CML's arguments and hereby adopts its definition of Extruder as stated above. (See Doc. No. 32-3 at 2). Thus, the extrusion die and lips and cooling rolls are not considered component parts of the Extruder.

## IV. CONCLUSION

The Court adopts the Plaintiff's definition of Extruder and finds that the terms of the Endorsement do not apply to the Breakdown of non-Extruder Covered Equipment.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 31) is **DENIED**.

Signed: May 12, 2009

Robert J. Conrad, Jr.
Chief United States District Judge